# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| ZACHRY ALEXANDER BROWN, and ZAC BROWN COLLECTIVE, INC., | |
| Plaintiffs, | |
| v. | Civil Action No. 1:24-CV-2203-WMR |
| KELLY YAZDI, | |
| Defendant. | |

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In accordance with Local Rule 56.1, Plaintiffs Zachry Alexander Brown and Zac Brown Collective, Inc. ("ZBC") (together, "Plaintiffs") submit this Statement of Additional Material Facts in Opposition to Defendant Kelly Yazdi's Motion for Summary Judgment.

1.     Since 2013, Mr. Brown has owned and operated ZBC, a lifestyle and entertainment company with many distinctive brands under its umbrella. *See* ECF 56-1 ¶¶ 3-4; ECF 22 ¶ 16.

2.     ZBC is 100% owned by Mr. Brown and is the entity through which he conducts his various businesses. *See* Ex. 4, Kresser Decl. ¶ 1.

3.     Among other things, ZBC owns (i) the exploiting rights to music produced, and musical compositions written, by Mr. Brown and the Zac Brown

1

Band; (ii) Mr. Brown's wine brand; (iii) Mr. Brown's merchandising business; (iv) the rights to work Mr. Brown creates as a producer and songwriter; (v) the rights to exploit his name, image and likeness, as well as the trademarks and service marks of the Zac Brown Band; (vi) the Zac Brown Band's global live performance business; and (vii) various other related assets. Ex. 4, Kresser Decl. ¶ 3.

4.     In addition to founding the Zac Brown Band and leading it through its overwhelming success, Mr. Brown is also credited as an impactful songwriter, producer, entrepreneur, businessman, and philanthropist. *Id.* ¶¶ 2-4; ECF 22 ¶ 17.

5.     Mr. Brown is also the founder, a spokesperson, and frequent camp counselor of Camp Southern Ground, a 501(c)(3) nonprofit organization in Peachtree City, Georgia whose mission is to contribute to the development and well-being of children from all backgrounds, races, and religions with an emphasis of those with developmental issues, and to offer wellbeing programs to the nation's veterans. Ex. 4, Kresser Decl. ¶ 4.

6.     Mr. Brown's public image and the public image of his band are central to—and among the most important business interests of—ZBC. Ex. 4, Kresser Decl. ¶ 5; *see also* Ex. 2, Kresser Dep. at 78:2-11; 82:1-11; 82:20–83:6; 83:25–84:7; 88:6-11.

7.    Mr. Brown and ZBC have worked extensively to protect Mr. Brown's and his band's public image as important, and legitimate, business interests of ZBC. Ex. 4, Kresser Decl. ¶¶ 5, 11.

8.    That includes Mr. Brown working diligently throughout his longstanding career to keep his personal life and that of his family out of the public domain and intentionally choosing not to publicly share his personal or political beliefs on various topics so that fans listen to his music for the music itself, not the personal beliefs of himself or his bandmates. Ex. 4, Kresser Decl. ¶ 6.

9.    Given his position as a celebrity and the central figure in all that ZBC does, it is important to ZBC's and Mr. Brown's business to protect non-public information concerning ZBC, Mr. Brown, his family, and his band. Ex. 4, Kresser Decl. ¶ 7.

10.    The unauthorized disclosure of such non-public information could have serious negative impacts on Mr. Brown's and ZBC's business. Ex. 4, Kresser Decl. ¶ 8.

11.    Even the unauthorized disclosure of non-public information that may otherwise seem mundane could have serious negative impacts on ZBC's and Mr. Brown's business given his unique role as a celebrity and public figure. Ex. 4, Kresser Decl. ¶ 9.

3

12.    The unauthorized disclosure of non-public information concerning Mr. Brown could impact sponsorship or endorsement opportunities, lead to unwanted media attention, or have any number of other potential negative impacts on ZBC's and Mr. Brown's business. Ex. 4, Kresser Decl. ¶ 10.

13.    Mr. Brown and ZBC accordingly have worked diligently to protect sensitive non-public information concerning their business, Mr. Brown's public image, his family, and his band. Ex. 4, Kresser Decl. ¶ 11.

14.    Among those protections, ZBC employees who may have access to sensitive non-public information concerning Mr. Brown or ZBC are required to enter into an Employee Agreement and Confidentiality Agreement that contain provisions to protect confidential non-public information. Ex. 4, Kresser Decl. ¶ 12.

15.    The Employee Agreement restricts the use and disclosure of "Confidential Information" as defined therein, whereas the Confidentiality Agreement restricts the use and disclosure of "Private Information," as defined in that agreement. ECF 56-5 (Confidentiality Agreement) § 1; ECF 56-6 (Employee Agreement) § 3(c).

16.    Both agreements are intended to protect ZBC's legitimate business interests, which include protecting non-public information concerning ZBC, Mr. Brown, Mr. Brown's family, and the Zac Brown Band that, if disclosed without authorization, could negatively impact ZBC's business. Ex. 4, Kresser Decl. ¶ 14.

17.    Like other ZBC employees, when she was hired as an employee of ZBC, Defendant Kelly Yazdi entered into an Employee Agreement and a Confidentiality Agreement with ZBC, both dated August 24, 2022. Ex. 2, Kresser Dep. at 74:2–75:14; ECF 56-6 (Employee Agreement).

18.    ZBC required Ms. Yazdi to enter into these agreements to, among other things, protect ZBC's legitimate business interests by prohibiting Ms. Yazdi from using or disclosing "Confidential Information" or "Private Information" except as permitted by her respective agreements. Ex. 4, Kresser Decl. ¶ 16.

19.    Prior to becoming an employee of ZBC, Ms. Yazdi had operated her own business for several years and was experienced negotiating contracts, including commercial contracts for her business. Ex. 1, Yazdi Dep. at 9:13–10:15; 11:13–12:16.

20.    Ms. Yazdi testified that she would not sign an agreement if she had not read it and understood its terms. Ex. 1, Yazdi Dep. at 13:19–14:1.

21.    Section 3(b) of the Employee Agreement provides as follows:

The term "Confidential Information," as used in this Agreement, shall mean any and all data and information relating to the business of Company and/or its affiliated entities, including data and information relating to any third parties with whom Company does business (including its clients and prospective clients), that is disclosed to, developed by or learned by you in the course of your employment with Company which has value to Company and is not generally known to Company's competitors. "Confidential Information" shall include all such data and information regarding Company's and its affiliated entities' owners, members, employees, officers and representatives, and

its and their respective contractors, consultants and advisors (individually, or in any combination, each a "Protected Party"). You agree that Zachry Brown and each member of his family and each member of the "Zac Brown Band" and each member of his or her family are Protected Parties hereunder. Confidential Information shall not, however, include data and information: (i) which has been voluntarily disclosed to the public by Company or the other relevant Protected Party, except where such public disclosure has been made by you without authorization from Company or the other relevant Protected Party; (ii) which is independently developed by you without the use of, or resort to, protected data or information; or (iii) which has otherwise entered the public domain through lawful means.

ECF 56-6, Employee Agreement § 3(b).

22.     Section 3(c) of the Employee Agreement states:

You shall not disclose any Confidential Information, or use any Confidential Information, except as authorized by Company. You shall at all times during your employment comply with all procedures and policies respecting Confidential Information that Company may promulgate from time to time. You shall only make such copies of Confidential Information as are absolutely necessary for you to perform your employment duties with Company. You shall not identify Company or any other owner of any of the Confidential Information in any advertising and publicity without the prior written permission of Company. Your obligations respecting any Confidential Information shall remain in effect during your employment and continue after termination for so long as such information remains confidential.

ECF 56-6, Employee Agreement § 3(c).

23.     Section 7 of the Employee Agreement provides:

Upon Company's request and, in any event, immediately upon the termination of your employment, you shall return to Company all Confidential Information, in any tangible form, in your possession, as well as all other memoranda, notes, records, drawings, manuals, disks, and other documents and media pertaining to Company's business, all

copies thereof, and all equipment or property of Company and any of its affiliates and clients.

ECF 56-6, Employee Agreement § 7.

24.    Section 9 of the Employee Agreement provides:

During your employment with Company and at all times thereafter, you shall not use or access, or attempt to use or access, any of Company's computer resources and systems (whether located on or off of Company's premises) other than those which you have been expressly authorized by Company to use or access, and then only to the extent authorized. You agree to comply with all policies and procedures concerning the security of Company's computer resources and systems that Company may issue from time to time. You expressly acknowledge the Company's computer resources and systems, including email servers and other communications devices and platforms (collectively, the "Company Systems"), are intended for use for Company-related communications only and that you have no right to, or expectation of, privacy with respect to communications conducted on, through or utilizing Company Systems. Company may disable your access to any or all Company Systems at any time with or without notice and shall have no obli[g]ation to return, back up or preserve any data or communications of a personal nature that may be stored on any Company Systems.

ECF 56-6, Employee Agreement § 9.

25.    In Section 10 of the Employee Agreement, the parties further agreed as

follows:

The covenants of this Agreement shall be severable and if any of them is held invalid because of its duration, scope of area or activity, or any other reason, the parties agree that such covenant shall be adjusted or modified to the extent necessary to cure that invalidity and the modified covenant shall thereafter be enforceable as if originally made in this Agreement. You agree that the violation of any covenant contained in this Agreement may cause immediate and irreparable harm to Company, the amount of which may be difficult or impossible to estimate or determine. If you violate any covenant contained in this

Agreement, Company shall have the right to equitable relief by injunction or otherwise, in addition to all other rights and remedies afforded by law.

ECF 56-6, Employee Agreement § 10.

26.   Ms. Yazdi knew that the Employee Agreement protects ZBC's business information, which she characterized as "anything under the Zac Brown Collective, Inc." Ex. 1, Yazdi Dep. at 33:15-18.

27.   She also acknowledged that the Employee Agreement protects "information [she] learned through [her] employment[.]" Ex. 1, Yazdi Dep. at 34:16–35:1.

28.   The preamble to the Confidentiality Agreement Ms. Yazdi executed with ZBC provides, in part:

> As an employee of Company, you have had and/or will continue to have access to information regarding Company and/or its affiliated entities (including, without limitation, Home Grown Music, Inc., No Reserve, Inc, Southern Ground Family, Inc., Southern Ground Artists, Inc., Weimerhound Publishing, Inc., Baby Goo, Inc. and Southern Reel, Inc.), their owners, members, employees, officers and representatives, and their contractors, attorneys, consultants and advisors (individually, or in any combination, each a "Protected Party"), which is either non-public, confidential, private or proprietary in nature and not available to the general public, including, without limitation, knowledge of (i) finances, investments and holdings of each Protected Party, (ii) each Protected Party's personal matters, activities and information, itineraries and travel plans, and (iii) activities or plans with respect to each Protected Party's career, including the music and entertainment industry (including without limitation any lyrics, music, artwork and any information regarding the activities and plans for their careers), letters, e-mails, text messages or other communications to or from each Protected Party.

ECF 56-5, Confidentiality Agreement at 1.

29.    The preamble goes on to provide, in part:

You agree that Zachry Brown and each member of his family and each member of the "Zac Brown Band" and each member of his or her family are Protected Parties hereunder. It is expressly agreed that included in the Private Information (as hereinafter defined), without limitation, is any information you have regarding each Protected Party's private life or professional life, unless such facts are publicly known as confirmed facts (i.e., not simply known beyond the Protected Party's immediate family, friends and professional advisors, but widely reported as fact [and not just rumor] in some form of national or regional public media). All such information (in any form) is hereinafter referred to as the "Private Information." It is imperative to each Protected Party to maintain this information in strict confidence. In addition, each Protected Party desires that you not communicate with the press, its agents and/or representatives (the "Press") or otherwise communicate with the public (through the Internet or by any other means) regarding the Private Information in any manner.

ECF 56-5, Confidentiality Agreement at 1.

30.    Section 1 of the Confidentiality Agreement provides:

You acknowledge that the Private Information and each Protected Party's privacy are special, unique and valuable assets of such Protected Party. To your knowledge, each Protected Party is using reasonable efforts to continuously control and keep confidential such Private Information and each Protected Party's privacy. Therefore, you agree to hold all Private Information and issues of each Protected Party's privacy in strict confidence and to take all steps and use such resources as are necessary to prevent disclosure, in any manner, of the Private Information, in whole or in part, or any issues of each Protected Party's privacy to any person by you. You agree not to copy, reproduce, alter, assign or sell the Private Information for any purpose whatsoever. You agree not to waive any attorney-client privilege or confidences or similar rights with your accountant or other professionals, to the extent your attorney and/or accountant possess any Private Information. Your obligations regarding Private Information will not apply to any

information once that information is or becomes generally known to the public through no fault of yours.

ECF 56-5, Confidentiality Agreement § 1.

31.    Section 4 of the Confidentiality Agreement provides:

You hereby acknowledge that the restrictions contained in this Agreement are, in view of the nature of each Protected Party's desire for privacy, reasonable and necessary to protect legitimate proprietary and privacy interests, and that any violation of the privacy and confidentiality provisions herein would cause irreparable harm for which the Protected Parties cannot be fully compensated by money damages alone. In addition, you agree that the confidentiality required herein is in the best interest of each Protected Party.

ECF 56-5, Confidentiality Agreement § 4.

32.    In Section 7 of the Confidentiality Agreement, the parties agreed as

follows:

If any provision of this Agreement is held to be invalid or unenforceable for any reason, such holding shall not invalidate the remainder of the Agreement. If such provision could be more narrowly drawn so as not to be invalid or unenforceable, it shall, as to such jurisdiction or person at issue, be so narrowly drawn without invalidating or affecting the remaining provisions of the Agreement.

ECF 56-5, Confidentiality Agreement § 7.

33.    In addition, Section 10 of the Confidentiality Agreement provides:

Both parties hereto acknowledge that they have received or had the opportunity to receive the advice of independent counsel to this Agreement regarding their rights and obligations regarding this Agreement. Based on such advice, the parties believe that all of the provisions of this Agreement are lawful and enforceable. However, the parties knowingly waive any and all possible claims that this

Agreement is, for any reason, illegal or unenforceable, in whole or in part. The parties each forever shall be estopped from asserting any illegality or unenforceability as to any provision of this Agreement. The parties agree that the fact that one party or the other has taken the lead in drafting this Agreement, or sections thereof, shall not cause the Agreement to be interpreted any differently against such drafting party, but in all cases it shall be interpreted as if each party had contributed equally to the drafting hereof.

ECF 56-5, Confidentiality Agreement § 10.

34.     Ms. Yazdi admitted that she believed the scope of the Confidentiality Agreement was lawful when she signed it and that she had the opportunity to receive the advice of independent counsel before signing it. Ex. 1, Yazdi Dep. at 31:23–32:15; 174:20–175:9.

35.     In addition to her Employee Agreement and Confidentiality Agreement, Ms. Yazdi signed and agreed to abide by ZBC's Employee Handbook on January 1, 2023. Ex. 5, Employee Handbook at 44; Ex. 2, Kresser Dep. at 122:16-25.

36.     Just above Ms. Yazdi's signature, the Employee Handbook states:



Ex. 5, Employee Handbook at 44.

37.     Section 1.2 of the Employee Handbook provides, ███████

███████ Ex. 5, Employee Handbook § 1.2.

38.    Section 3.0 of the Employee Handbook provides, ████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████ Ex. 5, Employee Handbook § 3.0.

39.    Section 3.3 of the Employee Handbook ████████████████

█████████████████████████████████████████████████

██████████████████ Ex. 5, Employee Handbook § 3.3.

40.    Section 3.9 of the Employee Handbook provides, █████████████

████████████████████████ Ex. 5, Employee Handbook

§ 3.9.

41.    In November 2023, Mr. Brown informed Ms. Yazdi in person that he

wanted a divorce. Ex. 3, Brown Dep. at 12:14-16; *see also* Ex. 4, Kresser Decl. ¶ 26.

42.    Mr. Brown and Ms. Yazdi publicly announced their divorce in

December 2024. Ex. 3, Brown Dep. at 98:13-21; *see also* ECF 22 ¶ 3.

43.    During this time period in late 2023 and early 2024, Ms. Yazdi's counsel

was engaged in negotiations with ZBC and Mr. Brown's counsel concerning the

terms of her employment separation and divorce. Ex. 1, Yazdi Dep. at 73:18–74:5;

Ex. 4, Kresser Decl. ¶ 27.

44.    By no later than December 21, 2023, Ms. Yazdi knew that she would soon be leaving ZBC. Ex. 4, Kresser Decl. ¶ 26; *see also id.* ¶¶ 27-28.

45.    For example, on December 21, 2023, Ms. Yazdi sent an email to Mark Kresser concerning the transfer of her job duties to other employees and expressly stating, "I will be leaving the company." Ex. 4, Kresser Decl. ¶ 26; Ex. 6, Dec. 21, 2023 Email K. Yazdi to M. Kresser at 1; *see also* Ex. 1, Yazdi Dep. at 64:9–65:15.

46.    Despite knowing that she would soon be leaving ZBC, between January 13, 2024 and February 8, 2024 (the penultimate day of her employment), Ms. Yazdi diverted to her personal email account from her ZBC work email address 173 emails and their attachments. Ex. 4, Kresser Decl. ¶¶ 17-18; ECF 22-3 (compiled list of emails forwarded by Ms. Yazdi to her Gmail account); Ex. 1, Yazdi Dep. at 136:3–137:7 ([ECF 22-33] "is the chart of emails in which I forwarded myself . . . I did forward these emails as indicated in this chart from my ███████████ email to my …. gmail account, yes.").

47.    A significant number of the documents Ms. Yazdi sent to her personal email address from her work email address contained highly sensitive non-public information concerning ZBC's business that Ms. Yazdi did not have authorization to take or send to her personal email address. Ex. 4, Kresser Decl. ¶¶ 19-23.

48.    That information included the following:

a. A confidential copy of a contract between a broker and one of ZBC's affiliates relating to a non-public agreement with a music venue for a restaurant partnership. This contract included proprietary information about a ZBC affiliate's business prospects. Ex. 4, Kresser Decl. ¶ 18(a).

b. A confidential concert venue tech package that includes highly sensitive documents showing the inner workings of the concert venue and accompanying show production. These materials were provided to ZBC under the terms of a strict non-disclosure agreement and described private business information about the concert venue. *Id.* ¶ 18(b).

c. A confidential valuation of, and financial projections for, Mr. Brown's most significant asset: his music catalog. This highly sensitive document includes projected values through 2056. *Id.* ¶ 18(c).

d. The confidential financial terms of an October 23, 2024 Zac Brown Band concert, including earnings and deductions. *Id.* ¶ 18(d).

e. A confidential investment proposal for Mr. Brown from a biotechnical company that includes the biotechnical company's global marketing plan and financial forecasting. *Id.* ¶ 18(e).

14

f.   A confidential endorsement offer from another third party, which includes the proposed financial terms of the third party's offer. *Id.* ¶ 18(f).

g.   Confidential salary information for fifty-six ZBC employees. *Id.* ¶ 18(g).

h.   A confidential presentation regarding Mr. Brown's wine company, which includes detailed valuations, sales data and projections, and materials created in anticipation of a potential sale. *Id.* ¶ 18(h).

i.   A confidential and yet-to-be-announced collaboration and marketing plan with another artist for an unreleased song, including launch dates and plans. *Id.* ¶ 18(i).

j.   Confidential internal passwords relating to an American Express account; security gate passwords and gate codes for a ZBC affiliate; passwords for a tour scheduling application, access to the ZBC company private jet, and the ZBC corporate headquarters video system. *Id.* ¶ 18(j).

k.   Confidential social media passwords for over 25 different ZBC accounts. *Id.* ¶ 18(k).

l.  Confidential Zac Brown Band ticket sales data, including dates and times of private events not known or available to the public. *Id.* ¶ 18(l).

m.  A confidential contract between a ZBC affiliate and an artist for artwork to be used as set pieces, backdrops, and potentially new merchandise for the Zac Brown Band's 2025 tour. *Id.* ¶ 18(m).

n.  A confidential copy of the ZBC Employee Handbook that contains internal company policies, including policies regarding compensation, recruitment, social media, and document retention. *Id.* ¶ 18(n).

o.  A confidential presentation concerning an undisclosed energy investment opportunity presented to Mr. Brown and ZBC, which includes non-public financial information regarding the endeavor and ZBC's internal evaluation of the opportunity. *Id.* ¶ 18(o).

p.  A confidential "Statement of Work" from ZBC's IT and cybersecurity contractor outlining its proposal to remediate and upgrade ZBC's technological infrastructure, which includes sensitive analysis of ZBC's internal IT systems. *Id.* ¶ 18(p).

q.  Confidential analysis provided to ZBC from a third-party digital consultant containing metrics concerning the Zac Brown Band's social media accounts. *Id.* ¶ 18(q).

r.  A confidential communication regarding the proposed contractual terms of Mr. Brown's collaboration with a retailing company, including royalties, projected revenue earnings, and communications amongst the parties' counsel. *Id.* ¶ 18(r).

s.  Confidential communications and financial projections regarding the potential trademark sale of Mr. Brown's wine brand. *Id.* ¶ 18(s).

t.  A confidential presentation from Mr. Brown's appraisal consultants depicting past, actual, and future projected revenues for Mr. Brown's wine brand, including specific sales data for various products and a detailed valuation of the brand's competitors. *Id.* ¶ 18(t).

u.  A confidential report containing merchandise sales for the Zac Brown Band, including exact SKU sales per unit as well as revenue figures for specific concert dates. *Id.* ¶ 18(u).

v.  A confidential contract between ZBC and an outside vendor related to ZBC's engagement of a travel partner. *Id.* ¶ 18(v).

49.  The above information Ms. Yazdi took without authorization relates to ZBC's business, was learned during the course of her employment, has value to

ZBC, and is not generally known to ZBC's competitors. Ex. 4, Kresser Decl. ¶ 19; *see also* Ex. 2, Kresser Dep. at 157:10-19.

50.    During her deposition, Ms. Yazdi admitted that at least some of the documents she took constitute confidential business information of ZBC. Ex. 1, Yazdi Dep. at 130:19-25; 133:20–134:14.

51.    Ms. Yazdi also admitted that (i) she knew she could not use ZBC's confidential information for her own personal purposes, Ex. 1, Yazdi Dep. at 28:5-11; (ii) forwarding these documents was a violation of ZBC's company policy, including the ZBC Employee Handbook, *id.* at 42:8-12 ("I understand now it was in vi- --violation of this company policy. I did not know at the time."); and (iii) she forwarded information to her personal email address from her work email address for the purpose of potentially using it against Mr. Brown in her divorce, *id.* at 75:22–76:1 ("I forwarded this email to myself because I believed it to be[] relevant to defending myself in the divorce proceedings . . . ."); *see also id*. at 82:6-12 (". . . this was a very relevant and important document or it was going to be, I believed, during our divorce proceedings, and that is why I forwarded this one to myself."); 119:7-15; 138:8-18; 140:23-11; 145:24–147:8 ("I knew that these financial documents would be important to . . . defending myself in my divorce . . .").

52.    Ms. Yazdi further testified that she may have shared at least some of the documents she took with her divorce counsel. Ex. 1, Yazdi Dep. at 142:14–143:7; ECF 29-1 (Yazdi Decl.) ¶ 9.

Dated: January 22, 2025                    Respectfully submitted,

*/s/ David L. Balser*
David L. Balser
Georgia Bar No. 035835
Brandon R. Keel
Georgia Bar No. 300303
Mandi Youngblood
Georgia Bar No. 643117
**KING & SPALDING LLP**
1180 Peachtree Street
Atlanta, Georgia 30309
Tel: (404) 572-4600
Fax: (404) 572-5100
dbalser@kslaw.com
bkeel@kslaw.com
myoungblood@kslaw.com

*Counsel for Plaintiffs Zachry Alexander Brown and Zac Brown Collective, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), the undersigned certifies that this document has been prepared in Times New Roman 14-point font in accordance with Local Rule 5.1(B).

*/s/ David L. Balser*

David L. Balser
Georgia Bar No. 035835

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that the foregoing document was electronically filed this day with the Clerk of the Court through the CM/ECF system, which will send notice of electronic filing to all counsel of record.

This 22nd day of January, 2025.

*/s/ David L. Balser*_____

David L. Balser

Georgia Bar No. 035835
