## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ZACHRY ALEXANDER BROWN
and ZACH BROWN COLLECTIVE,
INC.,

      Plaintiffs,

    v.

KELLY YAZDI,

      Defendant.

CIVIL ACTION
NO. 1:24-cv-02203-WMR

## FINAL ORDER AND JUDGMENT

Following a 4-day bench trial, this matter is now before the Court for a final decision on Plaintiffs' remaining claim for breach of contract and sole claim for relief in this case—a request for a permanent injunction against Defendant.

This lawsuit is ostensibly about restrictive covenants in an employee contract and a former employee's alleged violation of those contractual terms. But, in reality, it is about so much more than that. Plaintiff Zachry Alexander Brown ("Mr. Brown") and Defendant Kelly Yazdi ("Ms. Yazdi") were formerly married, but have now divorced. It is the failure of that relationship which is central to this dispute.

Prior to their marriage in Hawaii in August of 2023, Mr. Brown and Ms. Yazdi had been together for several years. During that time, Ms. Yazdi became involved in Mr. Brown's business, known as Zac Brown Collective ("ZBC"). This organization

1

is a holding company for various subsidiaries, all which involve either Mr. Brown's music career or investments made from the proceeds of his career. At first, Ms. Yazdi's involvement was informal; later, she became an employee subject to an employment contract, with her first position being that of the social media coordinator. Ultimately, during her engagement to Mr. Brown, she assumed the role as Executive Vice President. In that role (if not earlier), she seemingly was involved in all aspects of the business of ZBC.

Shortly before Thanksgiving 2023, approximately ten days after the couple had hosted friends at a wedding party in Nashville, Tn., Mr. Brown told Ms. Yazdi that he wanted a divorce. Soon thereafter, ZBC began excluding her from its business activities. Although she was not immediately removed from her position with ZBC, both the company and Ms. Yazdi began making plans for her to transition. During that approximately two-month period, Ms. Yazdi forwarded approximately 170 emails from her company email account to her personal email account. It is undisputed that many of these emails involved confidential business information of ZBC, her soon to be former employer.

Ms. Yazdi claims she forwarded these emails, at least in part, because some of them involved personal matters to her. That is likely true. As to confidential business information, she claims that she needed these emails to support her claims in the impending divorce case, which is also likely the case (as to at least some of

2

them).  Mr. Brown claims that her need for the information in the business emails doesn't legally justify her covertly taking them and that she could have obtained the information in discovery in the divorce lawsuit.  Again, that is also likely the case.

Further, Ms. Yazdi claims that most (or at least many) of these emails involve information to which she had access not because of her position as an employee of ZBC, but because of her status of girlfriend, fiancée, and then wife of Mr. Brown.  And, there is no doubt that her personal relationship with Mr. Brown afforded her great access to the inner workings of ZBC.  Yet, it is unmistakably the fact that at least some of the confidential information of ZBC came into Ms. Yazdi's possession in the course of and because of her employment with the company, and that Ms. Yazdi's taking of that information when she left was improper.

Underlying all of this is the personal animosity that represents the current state of affairs between Ms. Yazdi and Mr. Brown.  And, again, it really isn't hard to see why.  This divorce came quickly, mere months after the wedding ceremony and just a few days after a public celebration.  There is no doubt that Ms. Yazdi was hurt by these developments.  This is not a divorce case, but the presiding judge herein has participated in enough of those in his legal career to know that fault normally is shared when marriages break down.  Their story isn't unique, just more public than most due to the celebrity status of this couple.

And, it is fair to say that both parties have not always acted appropriately toward the other.  For example, Mr. Brown released a music video a day or so before filing his complaint for divorce which utilized scenes from their wedding party and featured a model who strongly resembled Ms. Yazdi, which arguably portrayed Ms. Yazdi in a negative light.  Likewise, Ms. Yazdi has often utilized her social media skills to eviscerate Mr. Brown, sometimes in relation to this lawsuit, but not always. A prime example of that is a post which mocks the recent engagement of Mr. Brown to another.

At the end of the day, the questions for this Court are relatively simple. In light of Ms. Yazdi's possession of confidential  business information of ZBC, represented by at least some of the emails that she forwarded to herself and other information that she would obviously know due to her employment with the company, has Ms. Yazdi breached the restrictive covenants of the contract and are Mr. Brown and ZBC entitled to a injunction to prevent Ms. Yazdi's disclosure of any such information to prevent harm to the business interests of the Plaintiffs?  Ms. Yazdi claims that she would never do that and, accordingly, that an injunction is not needed.  Yet, the Court believes that she has done so, at least on a few instances, even if the Court empathizes with her plight.  And, given the bad state of the parties' current relationship, for which both Mr. Brown and Ms. Yazdi jointly share the blame, the

Court believes that it is proper to issue an injunction to deter any further incursions in the future.

In so ruling, the Court relies on the following findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

### A. The Nature of Plaintiffs' Business

Mr. Brown is the founder, frontman, and lead vocalist for the musical group the Zac Brown Band. [Doc. 128 – Tr. Vol. 2B at 492:23, 516:2–517:6]. In addition to founding the Zac Brown Band, Mr. Brown is also a songwriter, producer, businessman, and philanthropist. [*Id*. at 516:23–520:16].

Since 2013, Mr. Brown has owned and operated ZBC—a lifestyle and entertainment company with many distinctive brands under its umbrella, each with an individual focus on music, food (wine), merchandising, fashion, design, real estate holdings, and the like.  Mr. Brown owns 100% of ZBC and conducts all his business ventures through ZBC.  Among other things, ZBC owns: (i) the rights to music produced by Mr. Brown and the Zac Brown Band; (ii) Mr. Brown's wine brand, Z. Alexander Brown; (iii) Mr. Brown's merchandising business; and (iv) the rights to material Mr. Brown creates as a producer. [Doc. 108 at 35 ¶¶ 1–2 (Pre-trial Order - Attachment E "Stipulated Facts"); Doc. 130 – Tr. Vol. 1A at 22:22–27:5; Doc. 128 – Tr. Vol. 2B at 517:7-14; *see also* Pls. Ex. 250].

**B.** Ms. Yazdi's Hiring as a ZBC Employee

Mr. Brown met Ms. Yazdi in Hawaii sometime in December of 2021, and the two became romantically involved. Mr. Brown and Ms. Yazdi eventually became engaged and began living together in May of 2022. [Doc. 128 – Tr. Vol. 2B at 522:1-11; Doc. 129 – Tr. Vol. 3B at 734:7-18].

A few months later, in August of 2022, Ms. Yazdi was hired by ZBC to work as the Social Media Coordinator.  As a condition of her employment, Ms. Yazdi entered into an Employee Agreement with ZBC dated August 24, 2022. [Doc. 130 – Tr. Vol. 1A at 27:17–28:1, 30:25–31:1; Doc. 127 – Tr. Vol. 1B at 252:9-19; Doc. 131 – Tr. Vol. 2A at 305:6-16, 308:10-11; Doc. 129 – Tr. Vol. 3B at 743:22-25, 745:11-13; Doc. 108 at 35 ¶ 3 (Pre-trial Order - Attachment E "Stipulated Facts"); *see also* Pls. Exs. 1[1] and 4; Def. Ex. 13].

Among other things, the Employee Agreement contains provisions to protect ZBC's Confidential Information. Specifically, Section 3(b) of the Employee Agreement, as modified through the Court's Order entered on August 6, 2025, provides as follows:

> The term "Confidential Information," as used in this Agreement, shall mean any and all data and information relating to the business of

---

[1] The version of Plaintiffs' Exhibit 1 that was presented to the witnesses reflected the Court's blue-penciling; however, the version of Plaintiffs' Exhibit 1 that Plaintiffs submitted to the Court did not. [*See* Doc. 133 – Tr. Vol. 4 at 1039:11-22 (Court and counsel discussing discrepancy)].

Company that is disclosed to, developed by or learned by you in the course of your employment with Company which has value to Company and is not generally known to Company's competitors. "Confidential Information" shall include all such data and information regarding Company's owners, members, employees, officers and representatives (individually, or in any combination, each a "Protected Party"). You agree that Zachry Brown and each member of the "Zac Brown Band" are Protected Parties hereunder. Confidential Information shall not, however, include data and information: (i) which has been voluntarily disclosed to the public by Company or the other relevant Protected Party, except where such public disclosure has been made by you without authorization from Company or the other relevant Protected Party; (ii) which is independently developed by you without the use of, or resort to, protected data or information; or (iii) which has otherwise entered the public domain through lawful means.

[Doc. 101 at 17 (modifying § 3(b) of Employee Agreement); *see also* Pls. Ex. 1 § 3(b)].

Section 3(c) of the Employee Agreement specifies the restrictions on Ms. Yazdi's use of Confidential Information, stating:

You shall not disclose any Confidential Information, or use any Confidential Information, except as authorized by Company. You shall at all times during your employment comply with all procedures and policies respecting Confidential Information that Company may promulgate from time to time. You shall only make such copies of Confidential Information as are absolutely necessary for you to perform your employment duties with Company. You shall not identify Company or any other owner of any of the Confidential Information in any advertising and publicity without the prior written permission of Company. Your obligations respecting any Confidential Information shall remain in effect during your employment and continue after termination for so long as such information remains confidential.

[Pls. Ex. 1 § 3(c)].

In Section 3(e) of the Employee Agreement, Ms. Yazdi agreed that, given the nature of the harm that ZBC would incur from disclosure of its Confidential Information, ZBC would be entitled to an injunction if Ms. Yazdi breached the agreement. That provision states:

> You acknowledge that any breach or threatened breach of any provision of this paragraph 3 shall result in serious and irreparable injury to Company for which Company cannot be adequately compensated by monetary damages alone. You expressly agree that Company shall be entitled to the remedies of injunction and other equitable relief to prevent or remedy a breach of this Agreement, which relief shall be in addition to any other rights or remedies, for damages or otherwise, which Company may have.

[Pls. Ex. 1 § 3(e)].[2]

Section 7 of the Employee Agreement further provides:

> Upon Company's request and, in any event, immediately upon the termination of your employment, you shall return to Company all Confidential Information, in any tangible form, in your possession, as well as all other memoranda, notes, records, drawings, manuals, disks, and other documents and media pertaining to Company's business, all copies thereof, and all equipment or property of Company and any of its affiliates and clients.

[Pls. Ex. 1 § 7].

Section 8 of the Employee Agreement states:

> You shall not publish or submit for publication (including, without limitation, through the use of the Internet, social media platforms, Twitter, broadcast media, *etc.*), or deliver any speech or other

---

[2] Section 10 of the Employee Agreement similarly provides: "If you violate any covenant contained in this Agreement, Company shall have the right to equitable relief by injunction or otherwise, in addition to all other rights and remedies afforded by law." [Pls. Ex. 1 § 10].

presentation, that contains or reveals any information relating to the business of Company o[r] Company's affiliates without receiving advance written clearance from an authorized representative of Company.

[Pls. Ex. 1 § 8].

Lastly, Section 9 of the Employee Agreement provides:

During your employment with Company and at all times thereafter, you shall not use or access, or attempt to use or access, any of Company's computer resources and systems (whether located on or off of Company's premises) other than those which you have been expressly authorized by Company to use or access, and then only to the extent authorized. You agree to comply with all policies and procedures concerning the security of Company's computer resources and systems that Company may issue from time to time. You expressly acknowledge the Company's computer resources and systems, including email servers and other communications devices and platforms (collectively, the "Company Systems"), are intended for use for Company-related communications only and that you have no right to, or expectation of, privacy with respect to communications conducted on, through or utilizing Company Systems. Company may disable your access to any or all Company Systems at any time with or without notice and shall have no obligation to return, back up or preserve any data or communications of a personal nature that may be stored on any Company Systems.

[Pls. Ex. 1 § 9].

In connection with her employment with ZBC, and in accordance with her Employee Agreement, Ms. Yazdi also agreed to comply with and be bound by the policies and procedures set forth in ZBC's Employee Handbook, which she signed on January 1, 2023. [Doc. 130 – Tr. Vol. 1A at 44:13-25; Pls. Ex. 1 § 3(c); Pls. Ex. 6 at 44]. Section 1.2 of the Employee Handbook provides that "[a]ll Company

property including, but not limited to, files, records . . . and any other materials that are property of Zac Brown Collective, must be returned to the Company upon separation." [Pls. Ex. 6 § 1.2]. Section 3.0 of the Employee Handbook provides that any "sensitive information of a confidential nature" including "sales figures or projections . . . marketing methods [etc.] . . . will be considered and kept as the private and confidential business records of the Company." [Pls. Ex. 6 § 3.0]. Section 3.3 of the Employee Handbook expressly prohibits the "[t]heft or inappropriate removal or possession of property" and "[u]nauthorized disclosure of Company confidential information." [Pls. Ex. 6 § 3.3]. Lastly, Section 3.9 of the Employee Handbook provides that "Employees may not forward Company emails to a personal email address." [Pls. Ex. 6 § 3.9].

**C.** Ms. Yazdi's Promotion and Increased Responsibilities as a ZBC Employee

In early 2023, after serving as Social Media Coordinator for only a few months, Ms. Yazdi was promoted to the role of Executive Vice President at ZBC. [Doc. 130 – Tr. Vol. 1A at 28:12-21, 120:14-17; Doc. 131 – Tr. Vol. 2A at 318:15–319:1; Tr. Vol. 4 at 902:7-9; *see also* Def. Ex. 4]. As Executive Vice President, Ms. Yazdi's job responsibilities included negotiating agreements with third parties (including vendors and endorsement partners), overseeing ZBC's finances and marketing strategy, scheduling touring and music launches, and assisting with human resources. [Doc. 130 – Tr. Vol. 1A at 28:14–30:17; *see also* Pls. Exs. 8–14,

17–18, 44–45, 86, 89–91, 94, 98–101]. And, Ms. Yazdi was not a traditional "9-to-5" employee. Ms. Yazdi's roles at ZBC, first as Social Media Coordinator and later as Executive Vice President, were positions where she worked around the clock managing ZBC's operations. [Doc. 131 – Tr. Vol. 2A at 320:1-12 (Ms. Yazdi: "[I]t was pretty much ongoing all the time"). Ms. Yazdi was directly involved in the flow of most information regarding ZBC's business, describing herself as both a "bridge and a shield" to communications with Mr. Brown on all business matters. [Doc. 129 – Tr. Vol. 3B at 751:4–752:25, 760:1–763:21].

As part of Ms. Yazdi's role as Social Media Coordinator and, later, as Executive Vice President, Ms. Yazdi received and possessed Confidential Information concerning ZBC's business. [Doc. 130 – Tr. Vol. 1A at 29:6-14, 64:23–65:3, 66:2–69:23, 72:2–76:7, 77:22–82:22, 86:21–89:15, 91:22–120:4; Doc. 127– Tr. Vol. 1B at 129:5–149:6, 205:13-20; Doc. 128 – Tr. Vol. 2B at 535:8–536:20; Doc. 133 – Tr. Vol. 4 at 902:2-6, 905:6-16, 935:14-17, 958:18–959:19. In fact, Ms. Yazdi became one of a select group of individuals who had access to the full scope of financial dealings for ZBC and was permitted to attend ZBC's confidential weekly financial meetings. [Doc. 130 – Tr. Vol. 1A at 29:9-30:1, 73:21-74:14]. Additionally, Ms. Yazdi participated in confidential strategic discussions and meetings regarding ZBC's efforts to promote music and drive ticket sales, merchandise sales, and fan engagement, including with the Zac Brown Band fan club, and she understood that

all of these strategies were important to ZBC's business. [Doc. 131 – Tr. Vol. 2A at 345:21–353:8].

**D.** The Divorce and the Termination of Ms. Yazdi's Employment with ZBC

In August 2023, approximately six months after Ms. Yazdi became ZBC's Executive Vice President, Ms. Yazdi married Mr. Brown. However, their marriage was short lived. Less than four months later, in November 2023, Mr. Brown informed Ms. Yazdi that he wanted a divorce. [Doc. 130 – Tr. Vol. 1A at 46:10-15; Doc. 128 – Tr. Vol. 2B at 528:14–529:16; Doc. 129 – Tr. Vol. 3B at 785:9–788:14]. Around the same time, Mr. Brown informed ZBC's CEO, Mark Kresser, that he could no longer trust Ms. Yazdi and did not want her to work for ZBC any longer. [Doc. 128 – Tr. Vol 2B at 525:1 –528:13; Doc. 132 – Tr. Vol. 3A at 654:5-12; Doc. 127 – Tr. Vol. 1B at 205:21–206:22]. Mr. Brown and Ms. Yazdi publicly announced their divorce in December 2023. [Doc. 108 at 35 ¶ 4 (Pre-trial Order - Attachment E "Stipulated Facts"); Doc. 129 – Tr. Vol. 3B at 801:15-16].

Between late 2023 and early 2024, Ms. Yazdi's counsel was engaged in negotiations with ZBC and Mr. Brown's counsel concerning the terms of her employment separation and divorce. [Doc. 108 at 35 ¶ 5 (Pre-trial Order - Attachment E "Stipulated Facts"); Doc. 129 – Tr. Vol. 3B at 795:4-13]. Thus, as early as December 2023, Ms. Yazdi was aware that her employment with ZBC would be coming to an end and that, as a result, she would lose access to her ZBC

email account. [*Id*.; s*ee also* Doc. 130 – Tr. Vol. 1A at 47:18–48:10, 49:10– 50:10; Doc. 131 – Tr. Vol. 2A at 390:8–391:21; Pls. Ex. 5]. On January 29, 2024, ZBC sent a notice letter to Ms. Yazdi informing her that her employment would be terminated effective February 9, 2024—although Ms. Yazdi already knew she would be leaving her employment. [Doc. 127 – Tr. Vol. 1B at 211:19–25; Pls. Ex. 7].

**E.** <u>Ms. Yazdi Forwards ZBC's Confidential Emails to Her Personal Email Account</u>

Between January 13, 2024, and February 8, 2024 (the penultimate day of her employment), Ms. Yazdi forwarded a multitude of emails and their attachments, many of them confidential to ZBC, from her ZBC email account to her personal email account even though she already knew she would be leaving ZBC. [Doc. 108 at 35 ¶ 6 (Pre-trial Order - Attachment E "Stipulated Facts"); Tr. Vol. 1A at 54:2–55:18; Pls. Exs. 133, 146]. These forwarded documents include, but are not limited to, the following:

- A valuation of, and financial projections for, Mr. Brown's entire music catalog, including projected values through 2056. [Doc. 130 – Tr. Vol. 1A at 56:10-24, 64:14–71:23; Pls. Exs. 10,11].

- An email providing an update on ZBC financial matters and attaching financial projections regarding the valuation and potential sale of Mr. Brown's wine brand. [Doc. 130 – Tr. Vol. 1A at 72:2–76:19; Pls. Exs. 99, 101].

- A presentation from appraisal consultants depicting past, actual, and future projected revenues for Mr. Brown's wine brand, including specific sales data for various products and a valuation—all of which was prepared in

connection with a potential sale of the brand. [Doc. 130 – Tr. Vol. 1A at 76:22–79:9; Pls. Exs. 89, 90].

- Salary information for ZBC employees, which ZBC does not disclose externally and only discloses internally when necessary. [Doc. 130 – Tr. Vol. 1A at 79:12–82:25; Pls. Exs. 44–45].

- An email reflecting the amount of money ZBC pays to various third-party business partners and program revenue allocated to those partners. [Doc. 130 – Tr. Vol. 1A at 83:3-12, 86:21–88:13; Pls. Ex. 14].

- An email from the talent agent for the Zac Brown Band, attaching a venue technical data package that includes documents showing the inner workings of the venue and accompanying show production—which was protected by a non-disclosure agreement ZBC executed with the venue. [Doc. 130 – Tr. Vol. 1A at 88:16–91:19; Pls. Exs. 17, 18].

- Emails concerning the proposed contractual terms of potential collaborations, tour sponsorship, and endorsement deals between Mr. Brown, retailers, and other partners, including royalties, projected revenue earnings, and discussions with counsel regarding negotiation of the deals. [Doc. 130 – Tr. Vol. 1A at 91:22–95:7, 111:23–114:10; Pls. Exs. 86, 106, 107].

- An email discussing a contract between a broker and one of ZBC's subsidiaries, Southern Ground Family Inc., relating to an agreement with State Farm Arena for a restaurant partnership. [Doc. 130 – Tr. Vol. 1A at 95:10–100:3; Pls. Exs. 8, 9].

- Emails between ZBC employees, counsel, and others regarding merchandise partnerships for the Zac Brown Band, including financial terms of the partnerships. [Doc. 130 – Tr. Vol. 1A at 100:4–102:10; Pls. Ex. 98].

- Documents reflecting the financials of Zac Brown Band concerts, including the earnings information and venue-specific financial

arrangements, with detailed reports regarding the same. [Doc. 130 – Tr. Vol. 1A at 102:15–105:12; Pls. Exs. 12, 13].

- An email discussing a contract between a ZBC subsidiary, Homegrown Music Inc., and an artist for artwork to be used as part of an album cover, concert backdrops, and merchandise for the Zac Brown Band's concert tour. [Doc. 130 – Tr. Vol. 1A at 105:15–108:22; Pls. Exs. 91, 94].

- Emails involving Zac Brown, the Zac Brown Band, and counsel regarding an agreement for a piece of music that was being created in conjunction with another artist and attaching a draft of the agreement, reflecting the agreed financial and other terms of their arrangement. [Doc. 130 – Tr. Vol. 1A at 108:25–111:20; Pls. Exs. 87, 88].

- An email from ZBC's digital media consultants analyzing social media activity and statistics related to the Zac Brown Band and evaluating future strategies and budgeting for digital advertising. [Doc. 130 – Tr. Vol. 1A at 114:13–117:3; Pls. Ex. 119].

- Correspondence concerning an exclusive membership club for fans of the Zac Brown Band, attaching a document with strategy recommendations and market research regarding its fan club and the fan clubs of other musicians. [Doc. 130 – Tr. Vol. 1A at 117:6–120:7; Pls. Exs. 104, 105].

- An email from the Zac Brown Band's marketing/public relations firm attaching a branding presentation that includes information concerning proposed marketing strategies. [Doc. 130 – Tr. Vol. 1A at 121:20–122:18; Doc. 127 – Tr. Vol. 1B at 129:5–130:23; Pls. Exs. 117, 118].

- An email regarding the marketing plan with another artist for an unreleased song at the time, called "Butterly," including the timeline for future marketing dates relating to the song release. [Doc. 127 – Tr. Vol. 1B at 131:1– 135:9; Pls. Exs. 50, 51].

- Emails between Mark Kresser (ZBC's CEO), Zac Brown, and a ZBC employee discussing ZBC job transitions, internal disputes amongst employees, and other employment matters. [Doc. 127 – Tr. Vol. 1B at 135:12–137:4; Pls. Ex. 78].

- ▪ Emails from Mr. Kresser evaluating potential third-party investment and tour sponsorship opportunities, with term sheets, strategic and marketing plans, and financial forecasting documents provided to ZBC in connection with confidential discussions concerning such investment opportunities. [Doc. 127 – Tr. Vol. 1B at 137:7–145:8; Pls. Exs. 23, 25, 54, 55].

Ms. Yazdi did not have a business-related purpose for forwarding any of these confidential documents to her personal email account, nor did she receive authorization from Mr. Brown or anyone at ZBC to do so. [Doc. 130 – Tr. Vol. 1A at 56:1-9]. These documents were originally provided to Ms. Yazdi in the course of her employment at ZBC, and they contain information that has value to ZBC and is not generally known to ZBC's competitors or the public.

While Ms. Yazdi contends that she would have received the same (or similar) information as Mr. Brown's spouse, the Court is not convinced that these communications are the type that would typically occur between spouses. All of these documents were provided to Ms. Yazdi on her ZBC email account, which she only had because she was an employee of ZBC.  Furthermore, the emails themselves often reflect Ms. Yazdi performing work functions for ZBC, including providing marketing advice, reviewing proposed brand partnerships, and other conduct that was within the scope of her role as an employee. [*See* Pls. Exs. 8–14, 17–18, 44–45, 86, 89–91, 94, 98–99, 101, 104–05, 119]. And, although Ms. Yazdi is now trying to diminish her role as an employee, the evidence shows that Ms. Yazdi was heavily involved in the flow of confidential information at ZBC, gaining access to all aspects

of the Company as her role expanded to Executive Vice President. Moreover, the evidence showed that neither Mr. Brown nor Mr. Kresser previously provided confidential documents of this type concerning ZBC's business to any wife or girlfriend of Mr. Brown who had not signed an agreement like the one Ms. Yazdi signed in connection with her employment. [Doc. 127 – Tr. Vol. 1B at 230:10-15, 231:5–232:5; *see also* Doc. 128 – Tr. Vol. 2B at 522:24–523:13 (Mr. Brown testifying that he did not provide any of ZBC's confidential information to Ms. Yazdi prior to her execution of the Employee Agreement).

Given the sensitive nature of these documents, the Court also finds that the disclosure of the information therein would negatively impact ZBC's business, including Mr. Brown's and ZBC's dealings with third parties who expect Mr. Brown and ZBC to keep shared information confidential.  For instance, disclosure of the information in some of the documents would diminish ZBC's negotiating power by revealing sensitive information, such as the projected value of Mr. Brown's music catalog and wine brand, where those internal valuations were prepared in connection with evaluating potential sales of the assets. Disclosure of the information in some of the other documents would impact ZBC's dealings by revealing the monetary value of Mr. Brown's endorsements, ZBC's revenue splits with venues hosting Zac Brown Band concerts (which are negotiated individually with each venue), and the terms of ZBC's contracts with other recording and visual artists, among other things.

Lastly, disclosure of the information in the documents would harm ZBC's business by harming Mr. Brown and ZBC's goodwill and reputation, including by eroding trust with employees, third parties, and other artists. [*See* Doc. 130 – Tr. Vol. 1A at 31:19–32:10, 32:20–33:1; 35:1-12, 37:9–38:3, 69:21–70:11, 75:5–76:15, 78:17–79:6, 82:9-22, 88:1-10, 91:11-16, 94:22– 95:4, 99:15-25, 101:23–102:10, 105:1-9, 107:9-15, 111:9-17, 113:16-23, 116:19-25, 119:13–120:4; Doc. 127 – Tr. Vol. 1B 130:14-20, 134:19–135:9, 136:20–137:1, 140:10-19, 144:24–145:5, Doc. 128 – Tr. Vol. 2B at 520:20–521:25, 535:11-21, 536:5-24].

### F. Ms. Yazdi's Motives and Post-termination Conduct

Although motive is not an element of breach of contract, the record reflects that Ms. Yazdi's forwarding of these documents to her personal email account was not the product of a mistake. Rather, it was a calculated decision based on her desire to preserve and use the information contained in these documents for her personal benefit following her termination from ZBC.

Ms. Yazdi, by her own admission, had no ZBC business-related purpose for taking any of the documents described above from ZBC just before her termination. [*See* Doc. 131 – Tr. Vol. 2A at 366:3-6; Doc. 128 – Tr. Vol. 2B at 424:8 –439:8; *see also* Doc. 130 – Tr. Vol. 1A at 56:1-3, 70:12-14, 76:16-19, 79:7-9, 88:11-13, 91:17-19, 95:5-7, 100:1-3, 105:10-12, 108:20-22, 111:18-20, 114:5-7, 117:1-3, 120:5-7; Doc. 127 – Tr. Vol. 1B at 130:21-23, 136:5-7, 137:2-4, 140:22-24, 145:6-8, 146:18-

21, 148:25–149:3].  Given that fact, the only reasonable conclusion is that Ms. Yazdi took these materials for her own personal purposes, ostensibly to use them as leverage against Mr. Brown in their then-pending divorce proceeding. [ Doc. 128 – Tr. Vol. 2B at 438:16-24 (Ms. Yazdi: "I just wanted to defend myself in the divorce proceeding against Zac")].

Despite claiming that she did not continue to follow Mr. Brown's life or career or have a desire to cause him harm after their divorce, the evidence demonstrates otherwise.  Ms. Yazdi not only disclosed some of the confidential information in the documents to her divorce attorneys and financial advisors [*see* Doc. 131 – Tr. Vol. 2A at 317:3-23], but also she used certain information that she learned or obtained from ZBC to fuel her public attacks on Mr. Brown through social media following her termination. [*See* Doc. 128 – Tr. Vol. 2B at 446:25–472:25; Doc. 132 – Tr. Vol. 3A at 689:1– 691:15].

For example, Ms. Yazdi learned in her capacity as Executive Vice President that Mr. Brown was collaborating with Dolly Parton on a song titled "Butterfly." [Doc. 128 – Tr. Vol. 2B at 445:15–446:2; Pls. Exs. 50, 51]. After departing ZBC, and in an apparent reference to the unreleased "Butterfly" song, Ms. Yazdi began using butterfly images on social media, published a butterfly-themed poem titled "The Rebirth," and started using the hashtag "#ButterfliesDontBelongInNets" in her social media posts about Mr. Brown. [Doc. 128 – Tr. Vol. 2B at 454:1-15, 455:18–

456:11, 457:14-16, 460:5-9; Pls. Exs. 122, 174, 189, 223]. Further, the evidence

shows that Ms. Yazdi apparently coordinated the timing of her social media posts

regarding Mr. Brown, some of which contained butterfly references or images, to

coincide with the original marketing dates for the release of "Butterfly" that were

set forth in one of the documents she took from ZBC. [Doc. 128 – Tr. Vol. 2B at

451:2–456:11, 458:21–459:2, 461:12-21 (Q: "So your post was about 10 days prior

to when this was originally planned to be launched, correct?" Ms. Yazdi: "Yes."),

465:17–466:16; (Q: "You had not been using TikTok to post anything about your

relationship with Mr. Brown. And then a week or so -- a little more than a week

before this release date you started using TikTok to talk about this litigation with Mr.

Brown." Ms. Yazdi: "Chronologically what you're saying is correct"); *see also* Pls.

Exs. 50, 51]. Based on the foregoing, the Court finds that Ms. Yazdi used the

marketing information she took from ZBC to strategically time her public posts

about Mr. Brown containing butterfly references and imagery to interfere with Mr.

Brown and ZBC's business—as well to attract attention to herself (by creating the

perception that the "Butterfly" song is about her).

In addition, Ms. Yazdi publicly posted an unreleased cut of the music video

for the song "Beautiful Drug" on her YouTube page without authorization from Mr.

Brown or ZBC. [Doc. 132 – Tr. Vol. 3A at 689:1–695:23; Pls. Ex. 186]. Although

the music video at issue here was filmed, produced, and paid for by ZBC, the video

itself consisted entirely of footage from Ms. Yazdi and Mr. Brown's wedding party which was attended by their family, friends, and other guests. [*See id.*; Doc. 128 – Tr. Vol. 2B at 540:7-14; Doc. 129 – Tr. Vol. 3B at 706:4–708:9, 776:19–780:4 ; Doc. 132 – Tr. Vol. 3A at 685:6-13, 692:1–695:22; Doc. 133 – Tr. Vol. 4 at 921:25–922:14]. However, under these unique circumstances, the Court finds that the music video incorporating Ms. Yazdi's wedding party was not Mr. Brown or ZBC's wholly proprietary confidential information. However, as will be discussed below, Ms. Yazdi's posting of the video is relevant to her intent to do harm to Mr. Brown and ZBC.

After Ms. Yazdi was terminated as an employee and the divorce proceedings were initiated, ZBC released an edited version of the "Beautiful Drug" music video that did not feature Ms. Yazdi, but, rather, featured a model that strongly resembled Ms. Yazdi. In the final version of the video that was released by ZBC, it appeared (at least arguably) that the look-alike model was taking drugs. [Doc. 128 – Tr. Vol. 2B at 541:23–545:15; Doc. 132 – Tr. Vol 3A at 697:16–698:10]. Later, as part of her public campaign against Mr. Brown, Ms. Yazdi posted a comparison of the released video to the unreleased version she had in her possession, apparently because she wanted to show that Mr. Brown and ZBC's released version of the music video was about her and that it casted her in a negative light. [*See id*.; Doc. 129 – Tr. Vol. 3B at 705:5-17]. Ms. Yazdi also placed the comparison of these videos on her business

website, where she generates revenue from selling products and advertising herself as a model and actress for hire. [Doc. 131 – Tr. Vol. 2A at 388:9–389:16; Doc. 128 – Tr. Vol. 2B at 459:5-13; Doc. 133 – Tr. Vol. 4 at 923:10–925:2].

Although Ms. Yazdi testified that she "do[es] not pay attention to anything in [Mr. Brown's] world," "want[s] nothing to do with him in [her] life," and "[doesn't] want to be affiliated with him" anymore [Doc. 128 – Tr. Vol. 2B at 444:8-9, 503:7], the evidence of Ms. Yazdi's social media activity suggests that she remains displeased over their failed marriage and Mr. Brown's recent engagement to another woman. [Tr. Vol. 4 at 927:2–947:14; Pls. Exs. 220, 222, 223, 228, 229]. Ms. Yazdi's apparent resentment towards Mr. Brown, coupled with her possession of ZBC's confidential business-related information, goes to the heart of Plaintiffs' request for injunctive relief and desire to prevent further disclosures of such information.[3]

## II. CONCLUSIONS OF LAW

### A. Plaintiffs' Breach of Contract Claim

#### 1. *Enforceability of Employee Agreement*

The Court has previously ruled that the Employee Agreement between ZBC and Ms. Yazdi is an enforceable contract under Georgia law and its confidentiality

---

[3] For instance, Ms. Yazdi admitted that in her employment role she had inside knowledge of ZBC's marketing strategies and other information regarding Mr. Brown's soon-to-be-released new album. And, the evidence shows that she made social media posts claiming to the public that many of the songs on that yet-to be-released album are about her and that she has an "untold" story to tell. Further, she admitted at trial that she does not want to be controlled in what she says. [Doc. 133 at 936:14–936:20, 943:21–944:14].

provisions (as modified through the Court's blue-penciling) are binding on Ms.
Yazdi. [*See* Doc. 101 at 16-18 ("[T]he Court concludes that the Employment
Agreement, as revised, is enforceable under the GRCA . . .").  However, Ms. Yazdi
argues that the Employee Agreement is unenforceable, as applied to her, because of
her joint role as both a ZBC employee and Mr. Brown's spouse. [*See* Doc. 129 – Tr.
Vol. 3B at 716:14–719:18; Doc. 133 – Tr. Vol. 4 at 1030:5-13.  In essence, Ms. Yazdi
contends that because she was both Mr. Brown's partner and an employee, one
cannot determine in what capacity she received information concerning ZBC's
business and, thus, that the agreement is unenforceable on vagueness grounds. [*Id*].
The Court disagrees.

The mere fact that Ms. Yazdi was also Mr. Brown's fiancée (and later spouse)
when she obtained certain Confidential Information does not alter the enforceability
of the Employee Agreement or render the agreement a nullity.  While Ms. Yazdi's
role as Mr. Brown's fiancée (and later spouse) might be relevant to whether the
information at issue is "Confidential Information" under the terms of the Employee
Agreement (*i.e.*, whether she obtained the information in the course of her
employment or solely in her role as Mr. Brown's spouse), this question does not bear
upon the enforceability of the agreement as a whole.  And, contrary to Ms. Yazdi's
position on the matter, the evidence reflects that Ms. Yazdi obtained the confidential
information at issue in the course of her job duties, irrespective of whether she was

also Mr. Brown's fiancée or spouse. [Doc. 130 – Tr. Vol. 1A at 33:19-22; *see also* Court's Findings of Fact, *supra* at pp. 16-17].

Additionally, courts frequently enforce restrictive covenants related to business despite the fact that the parties are family members. *See, e.g., Holland v. Holland*, 35 P.3d 409, 412–15 (Wyo. 2001) (holding that restrictive covenants are enforceable between ex-spouses); *Perricone v. Perricone*, 972 A.2d 666, 689–91 (Conn. 2009) (enforcing NDA between ex-spouses over ex-wife's argument that the NDA was too indefinite); *Dad's Prop., Inc. v. Lucas*, 545 So. 2d 926, 927–29 (Fla. Dist. Ct. App. 1989) (wife operated adult nightclub in violation of husband's covenant not to compete with Dad's Property, Inc. when husband "exerted considerable control over [its] design and operation"); *Weickgenant v. Eccles*, 140 N.W. 513, 514–15 (1913) (husband violated covenant not to compete with Weickgenant when wife used husband's money and family name to launch competing business and husband managed and controlled business); *Ingredient Tech. Corp. v. Nay*, 532 F. Supp. 627, 631–634  (E.D.N.Y. 1982) (husband violated restrictive covenant with plaintiff when his wife developed a competing business and he participated in it).  Any finding to the contrary in the present case would not only be inconsistent with the evidence, but also contrary to Georgia's public policy, which favors the enforceability of private contracts, including confidentiality protections in employment agreements. *See* O.C.G.A. § 13-8-50 ("The General

Assembly finds that reasonable restrictive covenants contained in employment and commercial contracts serve the legitimate purpose of protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state"); *Youngblood-West v. Aflac Incorporated*, NO. 4:18-CV-83 (CDL), 2019 WL 1601370, at *9 (M.D. Ga 2019), *aff'd,* 796 F. App'x 985 (11th Cir. 2019) (public has a "strong interest in the enforceability of contracts"); *Heartland Payment Systems, LLC v. Stockwell*, 446 F. Supp. 3d 1275, 1286 (N.D. Ga 2020) ("[T]here is a 'cognizable public interest [that] exists in upholding an agreement pursuant to which an employer sought to protect itself from post-termination piracy of the most valuable information it owns, as well as discouraging employees from breaching their employer's trust and misappropriating . . . confidential information for their own gain.'" (citation omitted).

### 2. *Ms. Yazdi's Breach of the Employee Agreement*

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *UWork.com, Inc. v. Paragon Techs., Inc.*, 321 Ga. App. 584, 590 (2013) (citation and internal quotation marks omitted).

Here, Plaintiffs are not seeking any damages on their claim for breach of contract; the only relief they seek for the breach of the Employee Agreement is a

permanent injunction.  Although damages are often recited as an element of a breach-of contract claim, a plaintiff is not required to prove damages when seeking only injunctive relief. The standard for injunctive relief requires there to be no adequate legal remedy, meaning that damages would not suffice. *See, e.g.*, *Youngblood-West*, 2019 WL 1601370, at *9 ("Permanent injunctive relief is required because the remedies available at law, such as monetary damages, would not be adequate if Youngblood-West breached the confidentiality provisions . . . again in the future."); *Kennedy v. Shave Barber Co., LLC*, 348 Ga. App. 298, 307–08 (2018) (injunction warranted where the plaintiff would suffer the irreparable harm of loss of customers upon breach of restrictive covenant); *see also* O.C.G.A. § 13-8-58(c) ("A court shall enforce a restrictive covenant by any appropriate and effective remedy available at law or equity, including . . . permanent injunctions").

Here, the parties do not dispute that from January 13, 2024, to February 8, 2024, Ms. Yazdi forwarded a multitude of emails (plus their attachments)—some of them twice—from her ZBC work email account to her personal email account just prior to her termination of employment.  And, as noted earlier, the Court finds that: (i) Ms. Yazdi had initially received those documents as an employee during the course of her employment; (ii) those documents have value to ZBC and are not generally known to ZBC's competitors or the public; and (iii) Ms. Yazdi had no legitimate business-related purpose for sending those confidential documents to her

personal email account at that time she sent them. [*See* Court's Findings of Fact, *supra* at pp. 13-18].

Ms. Yazdi argues that certain documents and information she forwarded to herself are not encompassed by the Employee Agreement because, in her view, the Court's blue-penciling struck language concerning "affiliated entities" and said information allegedly relates solely to ZBC's affiliates. [*See, e.g.*, Doc. 130 – Tr. Vol. 1A at 57:3-19; *see also* Doc. 101 at 17]. The Court rejects that argument. By striking the language regarding "affiliated entities," the Court was not finding that the Employee Agreement does not apply to business information relating to subsidiaries or affiliates of ZBC. Rather, the Court blue-penciled that language—as proposed by ZBC itself in the parties' briefing—because it was unnecessary. Even with the Court's revision, the definition of Confidential Information, consistent with the GRCA, protects information concerning the business of ZBC, which includes the business ZBC operates through its subsidiaries. There is no doubt that the information at issue concerns ZBC's business, all of which it operates through subsidiaries, given that ZBC itself is a holding company.

By forwarding ZBC's Confidential Information to her personal email account without any legitimate business purpose or authorization, by disclosing Confidential Information to third-parties or to the public on social media, and by physically retaining Confidential Information after her termination, Ms. Yazdi breached

Section 3(c), Section 7, Section 8, and Section 9 of the Employment Agreement. [*See* Pls. Ex. 1 at §§ 3(c), 7, 8, 9; Court's Findings of Fact, *supra* at pp. 7-9, 13-16, 18-20].

**B.**  Plaintiff's Request for a Permanent Injunction

The Court acknowledges that Plaintiffs and Ms. Yazdi have agreed that Georgia law would govern the "interpretation, performance and enforcement of the [Employee] Agreement." [Pls. Ex. 1 § 11]. However, some federal courts in Georgia have applied the federal authority when determining whether to issue a permanent injunction in similar cases. *See, e.g.*, *Heartland Payment Sys., LLC*, 446 F. Supp. 3d at 1282–86 (N.D. Ga. 2020) (recognizing that Georgia law applied to suit of restrictive covenants, but applying federal injunction law); *see also Youngblood-West*, 2019 WL 1601370, at *8–9. Although the Court will rely on both Georgia law and federal authority, the Court concludes that Plaintiffs are entitled to injunctive relief under either.

To obtain a permanent injunction, Plaintiffs are required to prove: "(1) that [Plaintiffs] ha[ve] prevailed in establishing the violation of the right asserted in [their] complaint; (2) there is no adequate remedy at law for the violation of this right; (3) irreparable harm will result if the court does not order injunctive relief; and (4) if issued, the injunction would not be adverse to the public interest." *Heartland Payment Sys.*, 446 F. Supp. 3d at 1283 (quoting *Thomas v. Bryant*, 614 F.3d 1288,

1318 (11th Cir. 2010)). Courts must also consider the balance of hardships between the plaintiff and defendant in determining whether to issue a permanent injunction. *See Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008). "[W]hether a permanent injunction is appropriate…turns on whether [Plaintiffs] can establish by a preponderance of the evidence that this form of equitable relief is necessary." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 n.10 (11th Cir. 2007).  Similarly, under Georgia law, "[e]ntry of a permanent injunction is appropriate only in clear and urgent cases where there is a vital necessity to prevent a party from being damaged and left without an adequate remedy at law." *Savannah Cemetery Grp., Inc. v. DePue-Wilbert Vault Co.*, 307 Ga. App. 206, 210 (2010).

A plaintiff, of course, need not wait until the anticipated, irreparable harm occurs before seeking an injunction. Indeed, the point of an injunction is to prevent the plaintiff from suffering irreparable harm that would result in the absence of an injunction. *See AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1175 (11th Cir. 2019) (emphasizing that injunctions prevent future harm); Lonnie E. Griffith, Jr., Anne E. Melley, and Lisa A. Zakolski, 14A Cyc. of Federal Proc. § 73:62 (3d ed. 2025) ("The purpose of a permanent injunction is to bar wrongful conduct reasonably likely to recur in the future, thereby preventing future harm or deterring future harm."). Rather than wait for the irreparable harm to

29

occur, a showing of "past infractions and a reasonable fear of future infractions justify a permanent injunction" under Georgia law. *Jacobs v. Chatham County, Ga.*, 295 Ga. App. 74, 77 (2008) (citation omitted).

The Georgia Restrictive Covenants Act ("GRCA") also expressly contemplates injunctive relief to enforce a restrictive covenant in an employment agreement. *See* O.C.G.A. § 13-8-58(c) ("A court shall enforce a restrictive covenant by any appropriate and effective remedy available at law or equity, including . . . permanent injunctions"); *Mullally v. CU Cap. Mkt. Sols., LLC*, 368 Ga. App. 602, 606 (2023) (observing that "the GRCA empowers the courts of this State . . . to craft remedies for the appropriate enforcement of the restrictive covenants" (citing O.C.G.A. § 13-8-58 (c)); *Heartland Payment Sys.,* 446 F. Supp. 3d at 1283–86 (granting permanent injunction pursuant to GRCA).

**1.** *Violation of the Right Asserted in Complaint*

In this case, Plaintiffs have asserted in their Complaint that they have the right to protect and maintain the confidentiality of their business-related information by virtue of the Employment Agreement between ZBC and Ms. Yazdi. As discussed above, Plaintiffs have established that Ms. Yazdi violated that right by forwarding confidential company emails to her personal email account with no business-related purpose, retaining those documents after her termination, and using or disclosing some of that information in breach of the Employment Agreement.

**2.** *No adequate remedy at law*

An injury is irreparable when it consists of any "unrecoverable monetary loss...includ[ing] situations where there is 'no adequate remedy at law to recover damages for the harm suffered.'" *Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022) (citations omitted). In this case, the evidence shows that Ms. Yazdi has breached her confidentiality obligations under the Employee Agreement by disclosing some of the confidential information she took from ZBC to third parties. [*See* Court's Findings of Fact, *supra* at p. 19]. Ms. Yazdi also used marking information she took from ZBS to make strategically timed posts on social media which included a butterfly-themed poem, butterfly imagery, and the hashtag "#ButterfliesDontBelongInNets," in a veiled reference to Mr. Brown and his unreleased "Butterfly" song, in an attempt to disparage Mr. Brown and interfere with his business. [*See* Court's Finding of Fact, *supra* at pp. 19-20]. Undoubtedly, such actions, coupled with her continuing posts on social media, have intangibly harmed Mr. Brown's professional reputation and caused him irreparable injury in the form of lost customer goodwill and business—none of which are easily calculable or easily compensable by money damages alone. See *Holland Ins. Group, LLC v. Senior Life Ins. Co.,* 329 Ga. App. 834, 841-44 (2014) (affirming in part trial court's grant of injunctive relief enjoining former employee from using and distributing confidential information in violation of employment agreement because disclosure

would cause irreparable injury to corporation); *Variable Annuity Life Ins. Co. v. Joiner,* 454 F. Supp. 2d 1297, 1304 (S.D. Ga. 2006) (granting injunction restraining former employee from breaching nondisclosure covenant because the plaintiff would otherwise suffer irreparable injury in the form of lost customer goodwill and business, neither of which were "easily calculable" or "easily compensable").  Thus, the Court concludes that Plaintiffs do not have an adequate remedy at law.

### 3. *Irreparable Harm if Injunctive Relief is not Granted*

The "[l]oss of confidential and proprietary information is per se irreparable harm." *G.W. Henssler & Assocs., Ltd. v. Marietta Wealth Mgmt., LLC*, No. 1:17-cv-2188-TCB, 2017 WL 6996372, at *6 (N.D. Ga. Oct. 23, 2017). This is so because "once confidential information is disclosed, it cannot be taken back." *Hurry Fam. Revocable Tr. v. Frankel*, No. 8:18-cv-2869-CEH-CPT, 2023 WL 23805 at *16 (M.D. Fla. Jan. 3, 2023) (citation and internal quotation marks omitted).

If Ms. Yazdi further uses or discloses any of the Confidential Information she took from ZBC, Plaintiffs would suffer considerable harm, including salary disputes and loss of trust with employees, the loss of goodwill and business opportunities, damage to Mr. Brown's and ZBC's reputations, and harm to Plaintiffs' business dealings and relationships with third parties which would place them at a serious economic disadvantage for future dealings—all of which cannot be adequately compensated through money damages. [*See* Court's Findngs of Fact, *supra* at pp.17-

18]. These are precisely the types of irreparable harm where an injunction is necessary because the difficulty in even quantifying damages from further breach would pose considerable hurdles to any future legal relief. *See Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 780 (11th Cir. 2015) ("[T]he loss of customers and goodwill is an irreparable injury.") (citation and quotation marks omitted); *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) ("Even when a later money judgment might undo an alleged injury, the alleged injury is irreparable if damages would be difficult or impossible to calculate." (citation and quotation marks omitted); *Doc Dev., Inc v. Devilbiss Healthcare, LLC*, No. 1:14-CV-1673AT, 2014 WL 12575756, at *1 (N.D. Ga. June 4, 2014) (concluding that loss of business opportunities and reputational harm warranted injunction where the damages would be difficult or impossible to quantify).

The appropriateness of injunctive relief under these circumstances is even reflected in Ms. Yazdi's Employee Agreement, where she agreed that injunctive relief would be an appropriate remedy for a breach of the confidentiality restrictions of the contract. [*See* Pls. Ex. 3 § 3(e) ("any breach or threatened breach of any provision of this paragraph 3[the confidentiality restrictions] shall result in serious and irreparable injury to Company for which Company cannot be adequately compensated by monetary damages alone. You expressly agree that Company shall be entitled to the remedies of injunction and other equitable relief to prevent or

remedy a breach of this Agreement ….”); *see also id.* § 10 (“You agree that the violation of any covenant contained in this Agreement may cause immediate and irreparable harm to Company, the amount of which may be difficult or impossible to estimate or determine. If you violate any covenant contained in this Agreement, Company shall the right to equitable relief by injunction or otherwise, in addition to all other rights and remedies afforded by law”).  Courts have acknowledged such contractual provisions in ruling on injunctive relief.  For example, in *E.A. Renfroe & Co., Inc. v. Moran*, the Eleventh Circuit affirmed the issuance of an injunction and, in doing so, quoted provisions of the employment agreements at issue where the defendants agreed that the plaintiff “would suffer ‘immediate and irreparable damage and loss’ upon the breach of the non-disclosure provision,” acknowledging that any argument opposing an injunction for failure to show damages was contrary to the parties’ agreement. 249 F. App’x 88, 92 (11th Cir. 2007); *accord Rayonier Advanced Materials Inc v. Byerly*, No. 2:21-CV-00063, 2021 WL 5067447, at *2 (S.D. Ga. Nov. 1, 2021) (granting permanent injunction where, among other things, “Defendant...acknowledged that any breach of the provisions of the NDA, would cause Plaintiffs irreparable injury which would not reasonably or adequately be compensated by damages in an action at law”); *AWP, Inc. v. Henry*, 522 F. Supp.3d 1294, 1306 (N.D. Ga. 2020) (“[W]hen a restrictive covenant acknowledges that a

breach may cause irreparable injury, the restrictive covenant entitles the employer to preliminary injunctive relief").

Furthermore, there is no requirement to establish future harm with certainty to obtain an injunction under Georgia law. *See Ellis v. Ga. Kraft Co.*, 219 Ga. 335, 336 (1963) ("equitable relief will not be denied where solid reasons are alleged and shown to justify the apprehension"). Rather, "past infractions and a reasonable fear of future infractions justify a permanent injunction." *Jacobs*, 295 Ga. App. at 77, (citing *Ellis*). That standard is met here.

In terms of past infractions, the evidence demonstrates that Ms. Yazdi has already taken and used Confidential Information in violation of her Employee Agreement. [*See* Court's Findings of Fact, *supra* at pp. 19-20 (Ms. Yazdi shared and used confidential information in connection with divorce proceedings; Ms. Yazdi used confidential marketing information to coordinate the timing of her butterfly-themed social media posts about Mr. Brown with ZBC's release of the Zac Brown Band's "Butterfly" song). And, Plaintiffs have also shown that they have a reasonable fear that Ms. Yazdi will disclose Confidential Information moving forward. Indeed, Ms. Yazdi continues to post negative information about Mr. Brown on social media; her posts about Mr. Brown and this litigation generate significant traffic to her profile; and she has monetized that traffic for her benefit. [*See* Court's Findings of Fact, supra at pp. 20-22; *see also* Pls. Exs. 220, 222–223, 228, 229].

Ms. Yazdi's future intentions are further reflected by the fact that she continued to post regarding Mr. Brown and this litigation despite her counsel's advice. [*See* Doc. 129 – Tr. Vol. 3B at 833:7-9 (Ms. Yazdi: "I had to go to the bat with my lawyers every single time [she posted] because lawyers [] tell you don't say anything. Don't do anything"); *see also* Doc. 133 – Tr. Vol. 4 at 943:21–944:14 (Ms. Yazdi admitting that she has an "untold" story to tell and that she does not want to be controlled in what she says)].

The fact that Ms. Yazdi has offered to return the documents likewise does not obviate the threat of future disclosure of Confidential Information or the need for a permanent injunction. Plaintiffs have demonstrated that even if Ms. Yazdi returned the documents that she forwarded from her work email address to her personal email address—which she is already obligated to do under her Employee Agreement—she still poses a threat to Plaintiffs because of her ability and propensity to use or disclose the Confidential Information she learned from such documents or otherwise in the course of her employment with ZBC. The mere fact that a former employee, like Ms. Yazdi, disclaims any intention of using or disclosing confidential material is not sufficient to negate the threat of irreparable harm, as courts routinely issue injunctions to enforce restrictive covenants despite a defendant's claimed assurances. *See Hayes Healthcare Servs., LLC v. Meacham*, No. 19-60113-CIV-*COHN*/SELTZER, 2019 WL 2637053, at *4-5 (S.D. Fla. Feb. 1, 2019) (court

rejected a similar argument made by a defendant, observing that "although [the defendant] now insists that he has no intent of using or disclosing ... confidential information, his actions suggest otherwise[,]" and defendant's assurances of non-disclosure and offering to return the confidential information "does not remove a threat of irreparable harm" and "does not obviate the need for a preliminary injunction"); *accord Mak, LLC v. Vuozzo*, No. 17-23310-CIV-ALTONAGA /Goodman, 2017 WL 8315926, at *2 (S.D. Fla. Nov. 7, 2017) (holding plaintiff satisfied his burden for injunctive relief and finding threat of irreparable harm despite defendant's sworn testimony that "he has not used . . . trade secrets or confidential information 'for any reason,' and will not attempt to do so in the future"); *Hayes Med. Staffing, LLC v. Eichelberg*, No. 0:23-cv-60748-GAYLES, 2024 WL 670440, at *10 (S.D. Fla. Jan. 23, 2024) ("While [defendants] testified that they have not used or disclosed [plaintiff's] trade secret and confidential information . . . and will not do so in the future, the threat of harm from retaining, even unintentionally, [plaintiff's] trade secrets cannot be cured through monetary remedies").

Unfortunately, the Court cannot accept Ms. Yazdi's assurances that she will not disclose the confidential information she possesses that she learned from the documents she took from ZBC, as well as through her employment with ZBC. Indeed, her very conduct in secretly taking confidential documents from ZBC when

she knew she was leaving the Company, coupled with her apparent animosity towards Mr. Brown reflected in her continuous social media posts, speak strongly to the possibility that she may act to harm Mr. Brown.

Lastly, the evidence shows that Ms. Yazdi has generated a large following from regularly posting about this litigation and Mr. Brown on her business website and social media platforms, generating millions of views on her posts. [*See* Pls. Ex. 238 (showing videos with 9.9M views, 7.5M views, and more)]. The fact that Ms. Yazdi may have a financial motivation to use Confidential Information against Mr. Brown and ZBC further show that there is a significant threat of disclosure or misuse of Confidential Information in the future which would harm Mr. Brown and ZBC.

Based on the foregoing, the Court therefore finds that Plaintiffs have demonstrated a reasonable fear that Ms. Yazdi will use or disclose Confidential Information in the future.

**4.** *An Injunction Would Serve the Public Interest*

The Court finds that the balancing of the parties' interests and that of the public tips in favor of issuing a permanent injunction.

Although Ms. Yazdi may have some interest in publicly airing her grievances against Mr. Brown or some of the information she learned in the course of her employment with ZBC, Plaintiffs' privacy interest in enforcing the confidentiality provisions in the Employee Agreement outweighs any hardship to Ms. Yazdi caused

by requiring her to comply with the contractual obligations to which she agreed. *See Youngblood-West*, 2019 WL 1601370, at \*9.  Where, as here, the purported harm to Ms. Yazdi from the Court issuing an injunction merely would be requiring her to comply with her contract, the public interest favors an injunction. *See NCR Corp. v. Manno*, No. 3:12-cv-121-TCB, 2012 WL 12888663, at \*9 (N.D. Ga. Oct. 26, 2012) (balance of harms favored granting preliminary injunction where any harm to former employee resulted from a contract "to which [he] agreed"); *Smallbizpros, Inc. v. Court*, 414 F. Supp. 2d 1245, 1251 (M.D. Ga. 2006) ("Although Defendants may suffer harm as a result of the injunction, this harm is the result of enforcement of a covenant not to compete to which Defendants agreed and which Defendants have not demonstrated violates public policy"); *Hurry Fam. Revocable Tr.*, 2023 WL 23805, at \*19 (holding that the "[d]efendant [would] suffer no hardship should he be enjoined from further violations of the NDA and required to return or destroy all . . . confidential information in his possession[,]" because the "[d]efendant only acquired the information through his employment with Plaintiffs, which he engaged in under a duty of confidentiality"); *Vital Pharms., Inc. v. Alfieri*, No. 20-61307-CIV-SINGHAL/VALLE, 2022 WL 1450042, at \*6 (S.D. Fla. May 9, 2022) (the defendant "pointed to no evidence as to how she would be harmed from an injunction that simply prohibits her from further maintenance, use, or dissemination of [the plaintiff's] confidential materials"); *Truepenny People LLC v. Cota*, No.

3:16cv424/MCR/CJK, 2016 WL 9308534, at *2 (N.D. Fla. Oct. 18, 2016) ("because [p]laintiff own[ed] the . . . confidential and proprietary information [that was] at stake, the harm to [p]laintiff outweigh[ed] any threat of potential harm to the [d]efendant from the injunction").

Furthermore, the public has a "strong interest in the enforceability of contracts," *Youngblood-West*, 2019 WL 1601370, at *9, and the public interest would not be disserved by issuing a permanent injunction in these circumstances. *See also* O.C.G.A. § 13-8-50; *Heartland*, 446 F. Supp. 3d at 1286 (reasoning that public interest would be served by enforcing "an agreement pursuant to which an employer sought to protect itself from post-termination piracy of the most valuable information it owns, as well as discouraging employees from breaching their employer's trust and misappropriating . . . confidential information for their own gain" (quotations omitted)).    In the present case, enforcing the Employment Agreement—where, among other things, Ms. Yazdi agreed ZBC would be entitled to injunctive relief in the event of a breach—favors the public interest.

Georgia courts are expressly directed by the legislature to construe a restrictive covenant "in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." O.C.G.A. § 13-8-54(a). It is in the public interest to construe the restrictive covenants in Ms. Yazdi's Employee Agreement in favor of protecting ZBC's legitimate business interests.

In sum, the Court finds that the permanent injunctive relief is warranted in this case. Plaintiffs have proven that Ms. Yazdi breached her Employee Agreement and that they are entitled to an injunction requiring Ms. Yazdi to return all Confidential Information to ZBC and to prevent the further disclosure of such information.

## III. CONCLUSION

For the above reasons, it is hereby **ORDERED** that **JUDGMENT** be entered in Plaintiffs' favor on Counts I and II of the Verified Amended Complaint. Accordingly, the Court grants Plaintiffs' request for a **PERMANENT INJUNCTION** as follows:

- ▪ Ms. Yazdi shall return to ZBC all Confidential Information in her possession, custody, or control within seven (**7**) days of this Order;

- ▪ Ms. Yazdi shall file a certification under oath in this case that she has returned all such information to ZBC at that time; and

- ▪ Ms. Yazdi shall refrain from using or further disclosing any of ZBC's Confidential Information.

**IT IS SO ORDERED**, this 12th day of January, 2026.



WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE